212 S.E.2d 724 (1974)
STATE ex rel. WEST VIRGINIA HOUSING DEVELOPMENT FUND, a public corporation, etc.
v.
John WATERHOUSE, as chairman, etc., West Virginia Housing Development Fund, etc.
No. 13468.
Supreme Court of Appeals of West Virginia.
November 26, 1974.
*726 Jackson, Kelly, Holt & O'Farrell, James K. Brown and William F. Dobbs, Jr., Charlotte R. Lane, Charleston, for petitioner.
Petroplus, Bailey, Byrum & Vieweg, George G. Bailey, Wheeling, for respondent.
*725 CAPLAN, Chief Justice:
Invoking the original jurisdiction of this Court, the petitioner, The West Virginia Housing Development Fund, a public corporation, hereinafter sometimes referred to as the Housing Fund, seeks a writ of mandamus to compel the respondent, John Waterhouse, Chairman of the Board of Directors of the aforesaid Housing Development Fund, to execute on behalf of the Fund, certain agreements, mortgage finance bonds and Series C Notes. Although Mr. Waterhouse was authorized, empowered and directed by lawfully adopted resolutions of the members of the Board of Directors of the Fund to execute on behalf of said Fund the agreements and notes alluded to above, he has refused to do so. His refusal is premised on his contention that the 1973 Amendments to the Housing Development Fund Act cause the Act to be unconstitutional.
The Housing Development Fund was created by Chapter 5, Acts of the Legislature, Second Extraordinary Session, 1968. In 1969, this Court declared that such Act was not violative of Article XI, § 1, Article VI, § 1 or Article X, §§ 1 and 6 of the West Virginia Constitution. State ex rel. West Virginia Housing Development Fund v. Copenhaver, 153 W.Va. 636, 171 S.E.2d 545 (1969).
In the 1968 Housing Development Fund Act it was the declared intention of the Legislature to provide for the "creation and establishment of the West Virginia housing development fund, the corporate purpose of which is to provide temporary financing for development costs, land development and residential housing construction to public and private sponsors of land development for residential housing or residential housing, new or rehabilitated, for sale or rental to persons and families of low and moderate income". Succinctly stated, the purpose of the Act was to provide help and assistance to the low and moderate income groups in their housing needs. W.Va.Code, 1931, 31-18-2(d), *727 as enacted by Chapter 5, Acts of the Legislature, Second Extraordinary Session, 1968, provided:
The legislature hereby finds and declares further that in accomplishing this purpose, the West Virginia housing development fund, created and established by this article, is acting in all respects for the benefit of the people of the State of West Virginia to serve a public purpose in improving and otherwise promoting their health, welfare and prosperity, and that the West Virginia housing development fund, so created and established, is empowered, hereby, to act on behalf of the State of West Virginia and its people in serving this public purpose for the benefit of the general public.
The 1973 amendments to the Housing Development Fund Act, where pertinent to this proceeding, may be summarized as follows:
A. The term "eligible persons and families" was substituted for the term "persons and families of low and moderate income."
B. Included in the newly created category of "eligible persons and families", in addition to persons and families of low and moderate income and persons who are included because of age or disability, are the following:
1) Persons or families of higher income to the extent the housing development fund shall find and determine, by resolution, that construction of new or rehabilitated residential housing for occupancy by them will cause to be vacated existing sanitary, decent and safe residential housing available at prices or rentals which persons and families of low and moderate income can afford; or
2) Persons and families for whom, as found and determined by the housing development fund by resolution, construction of new or rehabilitated residential housing in some designated area or areas of the State is necessary for the purpose of retaining in, or attracting to, such area or areas qualified manpower resources essential to modern mining, industrial and commercial operations and development in such area or areas.
C. A 1973 amendment of the Act, now designated W.Va.Code, 1931, 31-18-20b, as amended, created a mortgage bond insurance fund which is to be maintained in the state treasury. This insurance fund shall be kept separate and apart from all other moneys and funds of the state and shall constitute a trust fund into and from which moneys shall be paid in relation to the mortgage finance bonds authorized by the amendment. A special bond insurance commitment fee and a special bond insurance premium shall be charged by the Housing Fund on all loans or mortgages made or purchased with the proceeds of sale of mortgage finance bonds and shall ultimately be paid into the state sinking fund for investment as authorized by law.
This 1973 amendment further provides that in the event payments from the mortgage finance bond insurance fund at any time causes the amount therein to be less than the minimum bond insurance requirement such fact shall be certified by the chairman of the Housing Fund to the Governor and "the governor shall transfer to the state sinking fund commission for deposit in the mortgage finance bond insurance fund from any amounts previously appropriated which are available for such purpose an amount equal to the amount of such deficiency, and if the amount of such deficiency shall not be available from such prior appropriation or shall not have been so transferred, the governor shall include the amount of such deficiency not so transferred in the budget of his office to be submitted for appropriation to the next session of the legislature, and shall cause any amounts appropriated for such purposes to be transferred to the state sinking fund commission for deposit in the mortgage finance bond insurance fund: Provided, that the legislature shall not be required to *728 make any appropriation so requested, and the amount of such deficiencies shall not constitute a debt or liability of the State." W.Va.Code, 1931, 31-18-20b(d), as amended.
Subsection (e) of the above cited code section provides that subject to any agreement with the holders of outstanding notes or bonds of the Housing Fund, "any amount or amounts paid by the State into the mortgage finance bond insurance fund pursuant to this section shall be repaid to the State as, when, and to the extent, amounts held in the mortgage finance bond insurance fund at any time or times after any payment by the State into the mortgage finance bond insurance fund shall exceed the minimum bond insurance requirement at such time or times."
At a regularly called meeting of the Board of Directors of the Housing Development Fund, held on December 11, 1973, the board, with the respondent, Chairman Waterhouse, abstaining, adopted resolutions making certain findings and exercising the additional powers and authorities granted to the Housing Fund by the 1973 Amendments. The board adopted a resolution entitled "Mortgage Finance Bonds, Series A Resolution", authorizing the issuance of $10,000,000.00 in principal amount of its Mortgage Finance Bonds, Series A and the sale thereof through underwriters. It authorized, empowered and directed the chairman to execute on behalf of the Housing Fund the underwriting agreement necessary to effectuate the purpose of the resolution.
The board further adopted a resolution entitled "1974 Series C Note Resolution" providing for the issuance by the Housing Fund of up to $5,000,000.00 in principal amount of 1974, Series C Notes to finance residential housing in certain categories. It also authorized, empowered and directed the chairman to execute and deliver on behalf of the Housing Fund a certain note purchase agreement providing for the sale of the aforesaid 1974 Series C Notes.
Immediately after the board's action, respondent Waterhouse, in his capacity as chairman of the board of directors, delivered a letter to the board wherein he expressed his unwillingness and refusal to execute the instruments, as directed by the board, until a court of competent jurisdiction finally determined certain enumerated issues, all pertaining to the constitutionality of the 1973 amendments. It was this action of the respondent that prompted the institution of this proceeding in mandamus.
Following are the issues to be resolved in this proceeding:
(1) Whether the 1973 amendments providing for possible future legislative appropriations to make up any deficiencies in the mortgage finance bond insurance fund cause the mortgage finance bonds to constitute a debt of the state or a pledge of the credit of the state.
(2) Whether the provisions of the 1973 amendments are violative of Article V, § 1 or Article VI, § 51 of the West Virginia Constitution in requiring the Governor to transfer available moneys to the state sinking fund commission for deposit in the mortgage finance insurance fund, when a deficiency appears in that fund, or, if no such moneys are available, to require him to include the amount of the deficiency in the next budget of his office.
(3) Whether the participation by the Housing Fund in financing housing for the elderly, higher income housing, industrial development housing and public housing constitutes an improper delegation of legislative power in violation of Article VI, § 1 of our Constitution.
(4) Whether the participation by the Housing Fund in financing housing for the elderly, higher income housing, industrial development housing or public housing, as provided in the 1973 amendments, constitutes the fulfillment of a public purpose.
*729 The first question to be answered is whether the 1973 amendment (W.Va.Code, 1931, 31-18-20b(d), as amended), wherein it is provided that the legislature may make future appropriations to make up deficiencies in the mortgage finance bond insurance fund, is violative of Sections 4 and 6 of Article X of the West Virginia Constitution as constituting a debt or a pledge of the credit of the state.
The above code section, the pertinent part of which is hereinabove quoted, basically provides that in the event payments from the mortgage finance bond insurance fund causes the amount therein to be less than the minimum bond insurance requirements, the governor, if no other funds are available, shall place the required sum in the budget and shall transfer any amounts appropriated by the legislature to the state sinking fund commission for deposit in the mortgage finance bond insurance fund. It is significant that the foregoing is followed by this language: "Provided, that the legislature shall not be required to make any appropriation so requested, and the amount of such deficiencies shall not constitute a debt or liability of the State."
Mortgage finance bonds issued by the Housing Fund and insured by the mortgage finance bond insurance fund are self-liquidating revenue bonds similar to those approved in State ex rel. West Virginia Housing Development Fund v. Copenhaver, 153 W.Va. 636, 171 S.E.2d 545 (1969). Section 14 of the Housing Development Fund Act provides:
The State of West Virginia shall not be liable on notes, bonds or other evidences of indebtedness of the housing development fund and such notes, bonds or other evidences of indebtedness shall not be a debt of the State of West Virginia, and such notes, bonds or other evidences of indebtedness shall contain on the face thereof a statement to such effect.
Pursuant to the requirement of Section 14, the Series A Mortgage Finance Bond Resolution provides that any bonds issued by the Housing Fund shall notify prospective purchasers of the bonds that:
The principal of and interest on this bond are payable only from the revenues, funds and other property of the Housing Development Fund pledged therefor pursuant to the General Resolution and the State is not obligated to pay, and neither the faith and credit nor the taxing power of the State is pledged to the payment of, the principal of or interest on this bond. The State shall not be liable on this bond and this bond shall not be a debt of the state.
The constitutionality of self-liquidating revenue bonds as provided by the legislature in the Industrial Development Bond Act, has been upheld by this Court. State ex rel. County Court of Marion County v. Demus, 148 W.Va. 398, 135 S.E.2d 352 (1964). Therein, the Court said: "As heretofore stated the bonds which the county court may issue under this act are self-liquidating revenue bonds and Section 7, to repeat, specifically provides that they shall be payable out of revenues derived from such industrial plants; shall never constitute an indebtedness of the county, within the meaning of any constitutional provision or statutory limitation; and shall never constitute or give rise to a pecuniary liability nor be a charge against the general credit or taxing powers of the issuing body."
The Court in Demus quoted with approval Point 4 of the syllabus of Brewer v. Point Pleasant, 114 W.Va. 572, 172 S.E. 717 (1934), which reads: "Where an act, permitting a municipal corporation to issue bonds for a self-liquidating municipal project, provides that the bonds `shall not be a corporate indebtedness of such municipality,' the bonds do not create debts within the constitutional inhibition against the contraction of public debt."
In considering whether the pledging of certain revenues, formerly used for the payment of other expenses, to retire bonds issued for capital improvements, thereby forcing the legislature to appropriate additional *730 sums to take care of such other expenses, creates a debt of the state, this Court said in State ex rel. Board of Governors v. O'Brien, 142 W.Va. 88, 94 S.E.2d 446 (1956): "The promise made is to pay solely out of the special fund to be created, not out of general or property tax revenues but from fees collected from students at the university, other than fees from certain designated schools. No taxes or properties of the State are pledged or in any way made liable for the payment of the bonds. As already made clear, a debt to be paid in such manner does not constitute a debt within the meaning of that constitutional provision."
In view of the foregoing it becomes clear that the bonds of the Housing Fund are self-liquidating revenue bonds and do not constitute a debt of the state as prohibited by our Constitution. The only question remaining in this regard is whether the 1973 amendment, providing for possible future legislative appropriations to make up deficiencies in the mortgage finance bond insurance fund, if such occurs, creates a situation in which the bonds do constitute a debt or a pledge of the credit of the State.
Relying heavily upon State ex rel. Hall v. Taylor, 154 W.Va. 659, 178 S.E.2d 48 (1970), the respondent contends that the possible future legislative appropriations, as permitted in W.Va.Code, 1931, 31-18-20b(d), as amended, causes that statute to be violative of §§ 4 and 6 of Article X of our Constitution. In Hall the Court held that the issuance and sale of building commission revenue bonds payable solely from rents paid by state agencies from their annual appropriations from the general revenue fund created a debt of the State in violation of Article X, § 4 of the West Virginia Constitution. There it was also argued that the bonds did not constitute a debt of the State for the reason that future legislatures, by the language of the statute, were not required to appropriate the funds necessary to pay such rentals.
The Court rejected that argument, saying:
It is no answer to the invalidity of this statute and of the action of the Building Commission in issuing these bonds to say that some future legislature is not required to make an appropriation to one of these agencies or departments in order that the agency or department might make its payment of rent. The failure to make such an appropriation could result in the holders of the bonds taking over the buildings involved, and it is incomprehensible that any legislature would permit any such thing to happen. However, the test is not whether a future legislature is required to make such appropriations. The test is the authority to do so. Clearly the only source of income by which the bonds may be liquidated is the rent to be paid by the occupants of the buildings. Therefore, the reason for the invalidity of the statute lies in the authority of the legislature to make such future appropriations.
In support of his contention the respondent quotes the following language in the Hall case, supra: "It is the duty of the Court in this case to consider the substance of the plan envisioned by the statute in determining the question of constitutionality. Gould v. Greylock Reservation Commission, 350 Mass. 410, 425, 215 N.E.2d 114, 125. If the ultimate effect of the statute, when considered in its entirety, would be to create a state debt in violation of the constitutional provision in question, our duty is to declare that, in this respect, the statute is invalid. A mere legislative declaration that a state debt is not created by the statute is not conclusive or binding on a court. Whether a state debt is created by the statute is a judicial question, rather than a legislative question."
We are in agreement with the principles expressed in State ex rel. Hall v. Taylor, supra, on the facts in evidence in that case, but we find that case clearly distinguishable from the case at bar. In Hall the Court found constitutionally objectionable the legislature's *731 authority to appropriate funds for the payment of bonds where such bonds were of necessity payable solely from the general revenues of the state and did not contemplate any significant non-tax sources of revenue. It was therein recognized that the state is under a legal obligation to provide office space for its agencies and that should the legislature fail to make its annual appropriations for the payment of rentals, there being no other significant source for payment, such agencies would face eviction. As therein noted, "it is incomprehensible that any legislature would permit any such thing to happen." So strong was the obligation that the practical effect was to create a debt of the state.
In the instant case the mortgage finance bonds authorized by the 1973 amendments are true revenue bonds in every sense. The proceeds of these bonds will be used to finance mortgages for residential housing for private individuals. The bonds will be serviced by interest earned on the mortgages and repayments of principal therefrom and will be secured by a pledge of such mortgages. In the event of a default on a mortgage, moneys obtained by foreclosure together with insurance fees and premiums from other mortgage loans would be applicable to maintain the level of the mortgage finance bond insurance fund above minimum bond insurance re-requirement. If a deficit should occur and the legislature should decide to appropriate moneys to cover such deficit, the statute requires the mortgage finance bond insurance fund to repay the state any amounts so appropriated. Upon practical and legal considerations the objections expressed by the Court in State ex rel. Hall v. Taylor, supra, leading to the conclusion that a debt of the state was created, do not apply to the instant case.
The respondent's position that the Housing Fund Act, as amended in 1973, is violative of Article X, § 6 of the West Virginia Constitution, in that it authorizes a pledge of the credit of the state, is unfounded. As earlier noted, the bonds clearly provide that "the State is not obligated to pay, and neither the faith and credit nor the taxing power of the State is pledged to the payment of, the principal of or interest on this bond." In view of this unambiguous language, whereby the purchasers of the bonds are fully apprised that the credit of the state is not pledged, it is difficult to understand how the above constitutional provision is being violated. See Johnson v. Pennsylvania Housing Finance Agency, 453 Pa. 329, 309 A.2d 528 (1973), wherein it was held that an act, similar to ours, did not authorize the pledging of the credit of the state. See also Massachusetts Housing Finance Agency v. New England Merchants National Bank, 356 Mass. 202, 249 N.E.2d 599 (1969) and State ex rel. Warren v. Nusbaum, 59 Wis.2d 391, 208 N.W.2d 780 (1973).
In line with the principles expressed in the above cited cases, we interpret § 14 of the Housing Development Fund Act, herein quoted, and the above quoted language on the bonds, included pursuant to said § 14, as precluding the Housing Fund from giving any assurance that the state is bound to, or will, pledge its credit on account of said bonds. Furthermore, if the legislature should deem it advisable to make an appropriation to make up a deficit it would be made in aid of a public corporation created for the fulfillment of a public purpose. This type of activity is not constitutionally proscribed. Johnson v. Pennsylvania Housing Finance Agency, supra. See Basehore v. Hampden Industrial Development Authority, 433 Pa. 40, 248 A.2d 212 (1968) and Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834 (1938).
This Court expressly noted that the "purpose of Section 6 of Article X was to guard against the granting of the credit of the State in aid of any county, city, township, corporation or person . . . It was not, we think, intended to inhibit the use of the State's funds in carrying out public purposes". State ex rel. Dyer v. Sims, 134 W.Va. 278, 58 S.E.2d 766 (1950), reversed on *732 other grounds in 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951). It having been declared by the legislature that the subject act was designed to fulfill a public purpose, we find that it does not authorize the pledging of the credit of the state as proscribed by our constitution.
Employing the reasoning and even the language of the Hall case, supra, that is, that the Court must "consider the substance of the plan envisioned by the statute in determining the question of constitutionality", we find and hold that the sale of the subject revenue bonds does not constitute a debt or a pledge of the credit of the state. See State ex rel. West Virginia Housing Development Fund v. Copenhaver, 153 W.Va. 636, 171 S.E.2d 545 (1969).
The respondent next questions the validity of another aspect of the 1973 amendment of the Housing Development Fund Act, now designated as W.Va.Code, 1931, 31-18-20b(d), as amended. That statute, where pertinent to this issue, provides that in the event a deficiency shall appear in the mortgage finance bond insurance fund, the governor "shall" include the amount of such deficiency in the budget of his office to be submitted for appropriation to the next session of the legislature and shall cause any amount so appropriated to be transferred to the mortgage finance bond insurance fund. It is the contention of the respondent that this section violates Article V, § 1 and Article VI, § 51 of the West Virginia Constitution.
The thrust of the respondent's argument is that said § 20b(d) violates Article V, § 1 of our Constitution which provides for the separation of powers between the three branches of government and directs that neither shall exercise the powers of the others. The violation, says the respondent, results from the imposition of certain mandatory duties on the governor, namely, that he shall transfer certain funds to the sinking fund commission and that he shall include certain sums for a specific purpose in the budget of his office. The latter, relative to the budget, also constitutes a violation of Article VI, § 51, argues the respondent.
It is argued by the petitioner that the constitutional provision, Article VI, § 51, wherein it prescribes that the "budget shall embrace an itemized estimate of the appropriations, in such form and detail as the governor shall determine or as may be prescribed by law", reflects an intent to permit the legislature to pass laws requiring the governor to include certain items in the budget of his office. We reject this argument. This Court has held that Article VI, § 51 "clearly contemplates an executive budget." State ex rel. Brotherton v. Blankenship, W.Va., 207 S.E.2d 421 (1973). Were the power to require the governor to include specific items in the budget given to the legislature, as advocated by the petitioner, the concept of an executive budget would clearly be defeated. We hold, therefore, that wherein W.Va.Code, 1931, 31-18-20b(d), as amended, mandates that the governor shall include in his budget an amount for a specific purpose, such Code section is in violation of Article VI, § 51 of the West Virginia Constitution. In this regard, to the extent that such statute purports to permit the legislative branch to exercise powers of the executive, it is also violative of Article V, § 1 of our Constitution.
Although we have found the aforementioned statute to be violative of the Constitution of West Virginia, as above discussed, such unconstitutionality is not fatal to the Housing Fund Act or to all of the 1973 amendments thereof. § 20b(d), alluded to above, specifically relates to the requirement that the governor act to make up any deficit which may occur in the mortgage finance bond insurance fund. The elimination of this provision does not defeat the purpose of the Act, and such Act, particularly in view of the severability clause (31-18-25, as amended), continues to be in full force and effect. See State ex rel. State Building of West Virginia v. Bailey, 151 W.Va. 79, 150 S.E.2d 449 (1966); Robertson *733 v. Hatcher, 148 W.Va. 239, 135 S.E.2d 675 (1964); 16 Am.Jur.2d, Constitutional Law, § 187, and 82 C.J.S. Statutes § 93.
A further contention of the respondent is that the 1973 amendments of the Housing Development Fund Act respecting housing for the elderly (including nursing homes and intermediate care facilities), higher income housing, industrial development housing and public housing, constitute an improper delegation of legislative power in violation of Article VI, § 1 of the West Virginia Constitution. That provision reads in part, "The legislative power shall be vested in a senate and house of delegates."
Although as a general rule in this jurisdiction, the legislature cannot delegate its power to make law, it can delegate certain powers which may be exercised by it. It was said in State ex rel. West Virginia Housing Development Fund v. Copenhaver, supra, quoting from 16 Am.Jur.2d, Constitutional Law, § 242: "`As has already been indicated, the rule of nondelegability is applicable to legislative powers only;. . .. Thus, the rule is that in order that a court may be justified in holding a statute unconstitutional as a delegation of legislative power, it must appear that the power involved is purely legislative in naturethat is, one appertaining exclusively to the legislative department . . .. Purely legislative power, which can never be delegated, has been described as the authority to make a complete lawcomplete as to the time when it shall take effect and as to whom it shall be applicableand to determine the expediency of its enactment.'" The Court then went on to say:
The legislature enacted the law here in question and has not delegated to the Fund any purely legislative authority. It has, perhaps as a matter of absolute necessity, clothed the Fund with a power and duty, in a limited area, to exercise a degree of discretion or judgment in determining who are `persons and families of low and moderate income.' The legislature has not failed to set forth guidelines or standards to guide the Fund in the exercise of its judgment or discretion in this limited area.
It is asserted by the respondent that the failure to set standards in relation to the 1973 amendments results in the violation complained of here. The petitioner, on the other hand, says that the Fund's power to determine eligibility under the 1973 amendments is just an enlargement of that power declared to be constitutional in Copenhaver. It acknowledges that the legislature, when delegating discretionary power, must set forth adequate standards, Meisel v. Tri-State Airport Authority, 135 W.Va. 528, 64 S.E.2d 32 (1951), but contends that such standards exist in the subject legislation.
The functions delegated to the Housing Fund in the instant case are not purely legislative in nature. While it conferred discretionary powers to a degree, these are powers with which the legislature, as expressed in Copenhaver, supra, "perhaps as a matter of absolute necessity, clothed the Fund with a power and duty, in a limited area". Therefore, such powers of the legislature are delegable if adequate standards to carry out the legislation are included therein.
The objectives of the Housing Fund Act, as originally enacted and as amended in 1973, are forcefully expressed by the legislature. W.Va.Code, 1931, 31-18-2, as amended. The clear purpose of the act is to alleviate adverse conditions relating to housing in this state caused by depressed economic circumstances, urban renewal, relocation of highways, flood control projects, other public activities and natural disasters. It was found that these factors have resulted in "a serious shortage of sanitary, decent and safe residential housing available for occupancy by persons and families of all but the highest income levels". W.Va.Code, 1931, 31-18-2(d), as amended.
*734 First, as to the housing for the elderly, we find that under the urgent circumstances described by the legislature, the powers delegated by that body were accompanied by adequate standards so as to advise the Housing Fund of the limits of its authority. The legislature found that the state has experienced an exodus of population, resulting in a disproportionately high number of elderly, disabled and economically disadvantaged. Thereafter, it found as eligible persons and families, "Persons who because of age or physical disability are found and determined by the housing development fund, by resolution, to require residential housing of a special location or design in order to provide them with sanitary, decent and safe residential housing". W.Va.Code, 1931, 31-18-3(3)(c), as amended. This is adequate to guide the Housing Fund in its deliberations and supplies the necessary standards.
In relation to financing of housing for higher income groups under the Act, it is provided that the Housing Development Fund must find and determine by resolution that construction of such new housing will make available safe, decent and sanitary housing to families of low and moderate income at prices or rentals they can afford. If construction of such housing will not provide homes for families of low and moderate incomes then the Housing Development Fund should not so permit the use of its funds. Likewise, in relation to financing of industrial housing, the Housing Development Fund must find and determine by resolution that such housing is necessary for industrial development in this state. State ex rel. County Court of Marion County v. Demus, supra.
In carrying out the objectives of the Housing Fund Act, the 1973 legislature, in great detail, made findings which reflected the great need for housing, not only in the category of persons and families of low and moderate income, but in the other classifications noted herein. The legislature, also in great detail, stated the purpose of the Act and gave reasons why the inclusion in the Act of housing for the elderly, higher income groups and for industrial development would benefit the public in general.
Concerning the adequacy of the standards it has been held that great leeway is allowed the legislature in setting forth guidelines or standards. State of Iowa v. Steenhoek, Iowa, 182 N.W.2d 377 (1971). That court, citing Zilm v. Zoning Board of Adjustment, 260 Iowa 787, 150 N.W.2d 606, said: "the trend of modern decisions is toward greater liberality in the setting of standards and to require less exactness in them in legislative enactments." In Gilman v. City of Newark, 73 N.J.Super. 562, 180 A.2d 365 (1962), the following succinct language is found: "The mere fact that the standards set forth are general rather than specific does not militate against their acceptance and validity. The exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards.. . ." See Dickerson v. Commonwealth, 181 Va. 313, 24 S.E.2d 550 (1943).
Although, in the instant case, the standards relating to housing for the elderly and higher income groups and to industrial housing might have been stated with greater definiteness, it is reasonably apparent from the Act what those standards are. See Massachusetts Housing Finance Agency v. New England Merchants National Bank of Boston, 356 Mass. 202, 249 N.E.2d 599 (1969). The powers delegated by the legislature, not being purely legislative in nature but rather being discretionary authority to carry out the well defined purpose of the Act, do not constitute an improper delegation of powers.
The final inquiry in this proceeding is whether the participation by the Housing Fund in financing housing for the elderly, for higher income groups and for industrial development housing constitutes the fulfillment of a public purpose.
An examination of the declared legislative findings and purpose of the subject Act, as set forth in W.Va.Code, 1931, 31-18-2, *735 as amended in 1973, demonstrates unequivocally that the legislature considered its action as a fulfillment of a public purpose. Such was the holding in State ex rel. Housing Development Fund v. Copenhaver, supra. Therein, the Court held that "Legislative findings of fact which are made the basis of a legislative act are not thereafter open to judicial investigation." The Court then held that the Housing Development Fund was a public corporation created for public purposes and was not violative of Article XI, § 1 of the West Virginia Constitution.
We are in agreement with the decision in the Copenhaver case and are of the opinion that the principles expressed therein apply equally to the act as amended in 1973. We are guided by the salutary rule that a legislative declaration of purpose, while not conclusive, "is entitled not only to respect but to a prima facie acceptance of its correctness." Dornan v. Philadelphia Housing Authority, supra. See Johnson v. Pennsylvania Housing Finance Agency, supra.
What constitutes a public purpose varies with changing conceptions of the scope and function of government. As governmental activities increase by reason of the growing complexity of various phases of society, the concept of "public purpose" expands proportionately. In the past the poor were objects of charity. Today, the situation of such unfortunates is clearly within the scope of governmental activity. In the past government did not concern itself with problems created by inadequate housing of its citizenry. Today, it is acknowledged in a huge majority, if not all of the jurisdictions in our country, that adequate housing is a necessity in providing for the health, safety and general welfare of the people the basic fundamentals to be provided by government. Reflecting the foregoing is the following language from Johnson v. Pennsylvania Housing Finance Agency, supra: "The question of whether a citizenry had adequate and sufficient housing is certainly one of the prime considerations in assessing the general health and welfare of that body."
In the instant case the legislature has made detailed findings demonstrating the existence throughout the state of a critical shortage of safe, decent and adequate residential housing for occupancy for persons at all but the highest income level. These findings of shortages include nursing homes and intermediate care facilities suitable for occupancy by disabled and by elderly persons. Such shortages, it was found result in our inability to retain or attract the qualified manpower resources needed for industrial and commercial development. Further, these findings reflect the inability of private enterprise or political subdivisions to remedy these shortages.
In the following clear and unambiguous language, the legislature declared the Housing Development Fund Act to have been enacted in the fulfillment of a public purpose:
The legislature hereby finds and declares further that in accomplishing this purpose, the West Virginia housing development fund, heretofore created and established by this article, is acting in all respects for the benefit of the people of the State of West Virginia to serve a public purpose in improving and otherwise promoting their health, welfare and prosperity, and that the West Virginia housing development fund, heretofore created and established, is empowered, hereby, to act on behalf of the State of West Virginia and its people in serving this public purpose for the benefit of the general public. W.Va.Code, 1931, 31-18-2(h), as amended.
Commenting on the weight to be given a legislative declaration, this Court said in State ex rel. Appalachian Power Company v. Gainer, 149 W.Va. 740, 143 S.E.2d 351 (1965) "A legislative determination of what is a public purpose will not be interfered with by the courts unless the judicial mind conceives it to be without reasonable relation to the public interest." State ex rel.
*736 County Court of Marion County v. Demus, 148 W.Va. 398, 135 S.E.2d 352 (1964); Chapman v. Huntington Housing Authority, 121 W.Va. 319, 3 S.E.3d 502 (1939), and State ex rel. Warren v. Nusbaum, 59 Wis.2d 391, 208 N.W.2d 780 (1973). Certainly, as demonstrated by the above cited and quoted authorities, residential housing bears a reasonable relationship to the public interest.
It has been well established by many decisions of this Court that there is always a presumption in favor of the constitutionality of an act of the legislature. State ex rel. West Virginia Housing Development Fund v. Copenhaver, supra; State ex rel. Metz v. Bailey, 152 W.Va. 53, 159 S.E.2d 673 (1968); Willis v. O'Brien, 151 W.Va. 628, 153 S.E.2d 178 (1966). "When the constitutionality of a statute is challenged, every reasonable construction must be resorted to by the courts to sustain its validity and any reasonable doubt must be resolved in favor of the constitutionality of the legislative act in question." Point 2, Syllabus, State ex rel. Metz v. Bailey, supra.
Applying this principle to the instant case, together with the considerations discussed herein, the Court holds the Housing Development Fund Act, as amended in 1973, constitutional in all respects, except as noted in this opinion. Therefore, the writ of mandamus requiring the respondent to perform his nondiscretionary duty as prayed for is awarded.
Writ awarded.
SPROUSE, Justice (dissenting):
I respectfully dissent from the decision in the majority opinion. I feel that the 1973 amendments to the Housing Development Fund Act violate Article VI, Section 1 of the West Virginia Constitution. That provision in part declares: "The legislative power shall be vested in a senate and house of delegates." The 1973 amendments to the Act, vesting the Housing Fund with absolute discretion in determining what housing or housing projects may be built even though they might encompass higher income housing, are an improper delegation of legislative power in violation of this constitutional provision.
"The delegation by the legislature of broad discretionary powers to an administrative body, accompanied by fitting standards for their exercise, is not of itself unconstitutional." Chapman v. Huntington, West Virginia Housing Authority, 121 W.Va. 319, 3 S.E.2d 502. See also State ex rel. West Virginia Housing Development Fund v. Copenhaver, 153 W.Va. 636, 171 S.E.2d 545. A legislature may delegate discretionary power, such as was delegated in the 1973 Amendment, if adequate standards for the exercise of such discretion are set forth in the Act. Meisel v. Tri-State Airport Authority, 135 W.Va. 528, 64 S.E.2d 32. I differ from the majority in the application of this rule of law to the 1973 legislative action under review. The majority finds adequate standards for the exercise of discretion by the Housing Fund in the "legislative findings" and "purpose" of the Act. I feel the findings and purposes, as worthy as they may be, give no specific guidance because they are so broadly stated. Adequate standards should be specifically detailed in an enforceable portion of the legislation. Broad legislative findings and purposes are binding only in a general way and cannot constitute standards for the exercise of delegated powers.
It is not necessary to resort to an exhaustive review of the cases cited in the majority opinion concerning the sufficiency of standards for delegating discretionary or legislative power. Suffice it to say that the acts from the various jurisdictions cited in the majority opinion have definitely ascertainable standards and guidelines contained in the main body of those various legislative enactments.
I also disagree with a second major portion of the majority decision. I feel that the portion of the 1973 amendments permitting the Fund to finance higher income housing is constitutionally prohibited as allowing unauthorized expenditures of public funds for private purposes.
*737 The 1973 Amendment broadened the scope of the Act as approved in State ex rel. West Virginia Housing Development Fund v. Copenhaver, supra, to include the financing of (1) persons or families without limitation as to income, who because of age or disability, require residential housing of special location or design; (2) persons and families of higher income, if the Fund finds that construction of housing for them will cause existing and proper residential housing to be vacated which will become available to persons and families of low and moderate income; and (3) persons and families, without limitations as to income, for whom residential housing in a designated area of this State is necessary to retain or attract to such area manpower resources essential to modern mining, industrial and commercial operations and developments in such areas. Code, 1931, 31-18-3(3), as amended. The Housing Fund was also permitted to exercise the rights, powers and authorities of a public housing authority in any area of the State which the Fund finds necessary or appropriate. Code, 1931, 31-18-6(30), as amended.
This Court has repeatedly held that the Legislature is without power to appropriate public funds for other than public purposes. State ex rel. Lippert v. Gainer, 146 W.Va. 840, 122 S.E.2d 618; State ex rel. City of Charleston v. Sims, 132 W.Va. 826, 54 S.E.2d 729; State ex rel. Adkins v. Sims, 130 W.Va. 645, 46 S.E.2d 81. Conversely, this Court has also held that the Legislature is without power to levy taxes or appropriate public revenues for purely private purposes. State ex rel. Lippert v. Gainer, supra; State ex rel. Board of Governors v. Sims, 140 W.Va. 64, 82 S.E.2d 321; State ex rel. Catron v. Sims, 133 W.Va. 610, 57 S.E.2d 465; State ex rel. Bennett v. Sims, 131 W.Va. 312, 48 S.E.2d 13.
It is true that in State ex rel. West Virginia Housing Development Fund v. Copenhaver, supra, this Court held that financing for construction of low and moderate income housing was for a public purpose. I agree with that holding. The process of cultural metamorphosis has transformed our society from a distinct family and community based culture to a vast mass society. The change brought a concomitant and often noncontrollable poverty to certain of our people. The very existence of our nation requires us to constitutionally recognize the utilization of public resources to alleviate the harsh economic circumstances of citizens caught in this cultural trap. American legislatures have thus permissibly intervened into what was once strictly private areas because such areas have by cultural evolution become problems of the public domain. The use of public funds, however, to finance housing for all segments of the population without regard to income is certainly not for a public purpose. This does no less than to place the State of West Virginia, through the Housing Fund, in the business of banking, competing with a private industry in an area of strictly private endeavor. State assistance cannot be justified in order to achieve proper housing for the individuals possibly involved. This group includes persons of upper income statusmiddle income to multi-millionaire. They hardly need the assistance of public funds to obtain housing at whatever cost or for whatever purpose.
For the reasons stated, I would deny the writ.